PRESENT:  Lacy, Keenan, Koontz, Kinser, Lemons, and Agee, JJ.,
          and Carrico, S.J.

TERESA LEWIS

v.  Record No. 042743   OPINION BY JUSTICE BARBARA MILANO KEENAN

WARDEN OF THE FLUVANNA
CORRECTIONAL CENTER

UPON A PETITION FOR A WRIT OF HABEAS CORPUS

The petitioner, Teresa Wilson Bean Lewis (Lewis), pleaded guilty to seven felonies and was convicted of those offenses in the Circuit Court of Pittsylvania County.  The offenses included the capital murder of Charles J. Lewis, in violation of Code § 18.2-31(2) (capital murder for hire); the capital murder of Julian Clifton Lewis, Jr., in violation of Code § 18.2-31(2); conspiracy to commit capital murder in violation of Code §§ 18.2-22 and -31; robbery of Julian Clifton Lewis, Jr., in violation of Code § 18.2-58; use of a firearm in the commission of the murder of Julian Clifton Lewis, Jr., in violation of Code § 18.2-53.1; use of a firearm in the commission of the murder of Charles J. Lewis, in violation of Code § 18.2-53.1; and use of a firearm in the commission of the robbery of Julian Clifton Lewis, Jr., in violation of Code § 18.2-53.1.  The circuit court sentenced Lewis to death for each conviction of capital murder for hire, to life imprisonment for the robbery conviction, and to 33 years' total imprisonment for the conspiracy and firearms

1

convictions.  This Court affirmed the circuit court's judgment in <u>Lewis v. Commonwealth</u>, 267 Va. 302, 593 S.E.2d 220 (2004).

Pursuant to Code § 8.01-654, Lewis filed a petition for a writ of habeas corpus against Barbara Wheeler, the warden of Fluvanna Correctional Center.  Lewis made several claims, including that she was denied the effective assistance of counsel based on counsel's failure to conduct an adequate investigation of mitigation evidence and counsel's further failure to present such mitigation evidence during the penalty phase of her trial.[1]

This Court entered an order pursuant to Code § 8.01-654(C), directing the circuit court to conduct an evidentiary hearing limited to claims alleging counsel's failure to investigate and present mitigation evidence.  The circuit court conducted an evidentiary hearing (habeas hearing) and submitted a report to this Court stating the circuit court's findings of fact and recommended conclusions of law.[2]  See Code § 8.01-654(C)(3).

I. FACTS & PROCEEDINGS INVOLVING LEWIS' GUILTY PLEA

Before the circuit court accepted Lewis' guilty pleas, the court considered a competency assessment of Lewis prepared by Barbara G. Haskins, M.D., a board-certified forensic

---

[1] Lewis raised several additional claims in her petition for a writ of habeas corpus.  We have dismissed those additional claims today in a separate order.

2

psychiatrist. Dr. Haskins opined that Lewis had the capacity to enter pleas of guilty to charges of capital murder for hire and had the ability to understand and appreciate the possible penalties that might result from those pleas.

Haskins stated in her written competency assessment to the circuit court:

> Ms. Lewis is aware of her charges and the possible penalties she is facing (life without parole or death). She knows who her attorneys are and feels comfortable working with them. She is able to provide them with information, and to ask questions.

> Cognitive testing showed a Full Scale IQ of 72. Verbal IQ was 70, and Performance IQ was 79 . . .

> She is aware of the possibility of entering evidence for mitigation, should she be convicted. She is able to help develop such evidence.

Dr. Haskins concluded that Lewis was competent to stand trial and to enter pleas to the pending charges.[3] After considering this report and upon Lewis' pleas of guilty to the seven charges, the circuit court questioned Lewis and determined that her guilty pleas were made freely, voluntarily, and intelligently.

The circuit court accepted the Commonwealth's written summary of evidence that the Commonwealth would have presented

---

[2] The Honorable Charles J. Strauss conducted the evidentiary hearing and submitted the required report to this Court.
[3] Dr. Bernice A. Marcopulos, a clinical neuropsychologist, was appointed by the circuit court to administer I.Q. tests to

3

had the case proceeded to trial.  We will recite the relevant facts surrounding the offenses as described in our opinion in Lewis.

Julian Clifton Lewis, Jr., (Julian) was employed for several years by Dan River, Inc. (Dan River).  In 2000, Julian met Lewis, who also was employed by Dan River.  Lewis began to live with Julian at his home in Danville, and they later married.

In December 2001, Julian's older son, Jason Clifton Lewis, died in a car accident.  Julian was the beneficiary of his son's life insurance policy, from which Julian received proceeds in excess of $200,000.  He placed those proceeds in a draft account with Prudential Securities, Inc.  The sums deposited in the account were accessible only by use of drafts bearing Julian's signature.

In February 2002, Julian purchased a five-acre parcel of land in Pittsylvania County.  He also purchased a mobile home and placed it on the property, where he and Lewis resided.

In August 2002, Julian Lewis' younger son, Charles J. Lewis (C.J.), a member of the United States Army Reserve, was summoned for active duty.  According to Lieutenant Michael Booker, C.J.'s commanding officer, C.J. made arrangements for the disposition

Lewis.  The results of her testing appeared in Dr. Haskins' competency assessment.

4

of his estate in the event that he died while on active duty. C.J. executed a will, which identified his father as his primary beneficiary and his stepmother, Lewis, as the secondary beneficiary. C.J. obtained a life insurance policy in the amount of $250,000 payable in the event of his death. He designated his father as the primary beneficiary of the life insurance policy and Lewis as the secondary beneficiary.

In the autumn of 2002, Lewis met Rodney L. Fuller and Matthew J. Shallenberger at a retail store. Before this meeting, Lewis did not know these men. After engaging in a conversation, Shallenberger and Lewis exchanged telephone numbers and began to communicate frequently. They discussed a plan in which Shallenberger, with Fuller's help, would kill Julian and receive a share of insurance proceeds Lewis might obtain.

On one occasion, Lewis and her 16-year-old daughter, Christie Bean (Christie), met Shallenberger and Fuller at a parking lot in Danville. Christie, who had never met Fuller, had sexual intercourse with him in one car while Lewis and Shallenberger engaged in sexual intercourse in another vehicle. On a later date, Fuller and Shallenberger went to Lewis' home where she performed a "lingerie show" for the men, and she had sexual intercourse with both men.

5

On October 23, 2002, Lewis met Shallenberger and Fuller at a shopping center in Danville. Lewis gave the men $1,200 in cash to purchase firearms and ammunition to kill Julian. Antwain D. Bennett, an acquaintance of Shallenberger, used the money to purchase three firearms and ammunition for the weapons. Two of the firearms were shotguns.

On that same date, Lewis related to Shallenberger and Fuller the route that Julian traveled from his place of employment to his home. The men planned to kill Julian and "make the murder . . . look like a robbery." While Lewis remained at her home, the men were "to follow and stop Julian Lewis on the highway and kill him." The plan, however, was unsuccessful.

As a result, Lewis, Shallenberger, and Fuller decided to kill Julian at his home on October 30, 2002. They also decided to kill his son, C.J., when he returned to Virginia to attend his father's funeral, and to share the proceeds from C.J.'s life insurance policy. However, when the conspirators learned that C.J. would be with his father at the mobile home on October 30, 2002, they decided to kill C.J. and his father at the same time.

During the early morning hours of October 30, 2002, Shallenberger and Fuller drove a vehicle past Lewis' home about three times. The men did not stop their vehicle because they observed that lights were on in the home. Eventually,

Shallenberger and Fuller entered the residence through a rear door that Lewis had unlocked. Each man carried one of the shotguns that had been purchased with the $1,200 cash provided by Lewis.

Shallenberger and Fuller awakened Lewis, who was in bed with her husband. Shallenberger told Lewis, "Teresa, get up." After Lewis left the bed and walked into the kitchen, she heard gunshots.

Shallenberger shot Julian several times. Immediately afterward, Lewis went to the bedroom where her husband lay bleeding, retrieved Julian's pants and wallet, and returned to the kitchen with Shallenberger.

Fuller entered a room that was occupied by C.J. After Fuller shot C.J. three times, Fuller went to the kitchen where he observed Lewis and Shallenberger "pulling money from a wallet." Fuller told Lewis and Shallenberger that C.J. "wouldn't die." Fuller obtained Shallenberger's shotgun and returned to the bedroom occupied by C.J., shooting him two more times. The men collected most of the shotgun shells, and they divided the $300 in currency that had been removed from Julian's wallet.

After dividing the money with Fuller, Shallenberger told Lewis that he was sorry she "had to go through something like this; hugged her and kissed her; and the men left." Lewis

7

waited about 45 minutes after the "last shot was fired," and then made a telephone call to her former mother-in-law, Marie Bean. Next, she made a telephone call to her close friend, Debbie Yeatts.

On Wednesday morning, October 30, 2002, about 3:55 a.m., Lewis placed a telephone call to emergency response personnel in Pittsylvania County. She reported that an intruder had entered her home and had shot her husband and his adult son. Lewis stated that both men were dead. She said that she had been in bed with her husband when an intruder armed with a pistol entered the bedroom and said, "Get up."

Lewis further reported that her husband directed her to go into the bathroom. According to Lewis, her husband asked the intruder, "What's going on?" Lewis said that her husband was shot four or five times while she was in the bathroom. She reported that the shooting occurred at 3:15 or 3:30 a.m.

Sheriff's deputies Harris Silverman and Corey Webb arrived at the murder scene about 4:18 a.m., 23 minutes after Lewis made the telephone call to the emergency response personnel. When the deputies met Lewis at the front door of her home, she informed them that her husband's body was on the floor in one bedroom and that her stepson's body was in another bedroom.

As Deputy Webb entered the master bedroom, he observed that Julian was still alive. Julian "made slow moans" and uttered,

8

"[B]aby, baby, baby, baby."  Deputy Webb asked the victim his name, and he responded, "Julian."  When Deputy Webb asked Julian if he knew who had shot him, the victim responded, "My wife knows who done this to me."

While the deputies tried to assist the victims, Deputy Webb observed Lewis conversing on the telephone, and he heard her state, "I told C.J. about leaving that back door unlocked."  When Deputy Webb informed Lewis that her husband had died, she did not appear upset.

Investigator J.T. Barrett of the Pittsylvania County Sheriff's Office arrived at the murder scene about 7:00 a.m. on October 30, 2002.  When Barrett interviewed Lewis, she claimed that her husband had physically assaulted her a few days before his death, and she denied having knowledge about her husband's killer.  She said that she would not have killed her husband or have had him killed.

Investigator Barrett asked Lewis what she and her husband did before they went to bed on the night of the murders.  She said that she talked with her husband, and that they prayed together.  She stated that her husband went to sleep, and that she arose to prepare his lunch for the next day.  After preparing the lunch, Lewis placed it in the refrigerator.  She wrote a note on a lunch bag that stated, "I love you. I hope you have a good day."  A picture of a "smiley face" was drawn on the

9

bag and inscribed in the "smiley face" was the message, "I miss you when you're gone."

Mike Campbell, Julian's supervisor, testified that Julian did not use lunch bags to bring his lunch to work. Instead, Julian took his lunch to work in a blue and white cooler.

Investigator Keith N. Isom interviewed Lewis on November 7, 2002. During this interview, Lewis admitted that she had offered Shallenberger money to kill her husband. After this interview, Lewis again spoke with Investigator Isom. Lewis told Isom that she had met her husband's killer at a retail store and that he was from New York. Lewis stated that she "let him in" her mobile home, and that Shallenberger shot both Julian and C.J., took some money, and left the home. Lewis told Investigator Isom that she had agreed to give Shallenberger one-half the insurance proceeds she expected to receive, but that she changed her mind and decided to keep all the money. After Lewis provided Investigator Isom with Shallenberger's address, she and Isom went to Shallenberger's residence where Lewis identified him.

On November 8, 2002, while incarcerated in the Danville City Jail, Lewis asked to speak with Investigator Isom. When Isom interviewed her at the jail, she informed him that Rodney Fuller also was involved in the murders of her husband and her stepson. In addition, Lewis "acknowledged that after the

10

shooting and after the men left the house [on the night of the murders], she had waited about thirty minutes to call 911."

On the day of the murders, Lewis made a telephone call to Mike Campbell at Dan River. She informed Campbell that Julian had been killed, and stated that she wanted his paycheck. Campbell told Lewis that she could not retrieve the paycheck before 4:00 p.m. on that day. The next day, October 31, 2002, Lewis again called Campbell requesting Julian's paycheck. Campbell responded that he could not give the paycheck to her.

Lieutenant Michael Booker, C.J.'s commanding officer, contacted Lewis by telephone to express his condolences during the afternoon of October 30, 2002, the day of the murders. Lewis told Booker, "I'm still in shock. The police had me in Chatham today, all in my face. There is no way I would have killed my husband and stepson. They guessed that because I didn't get shot that I might have done it. My husband told me to go into the bathroom, so I did." Lewis informed Booker that she was the secondary beneficiary of the life insurance policy held by C.J., and that she wanted to collect the insurance proceeds.

On November 4, 2002, Lewis placed a telephone call to Booker and left a message for him because he was not available. When Booker spoke with her later that day, Lewis inquired about C.J.'s personal effects. Booker advised Lewis that she could

11

not have them because she was not the beneficiary of C.J.'s estate. Lewis asked Booker whether she was still entitled to the life insurance proceeds in the amount of $250,000. When Booker told Lewis that she was, Lewis responded, "[W]ell, Kathy [C.J.'s sister] can have all his stuff as long as I get the money."

Before the murders, Lewis stated to an acquaintance, Debbie Anderson, that she was just "using Julian for money and that he would buy her things." Bobby Demont, who had known Julian and Lewis for several years, heard Lewis comment "a couple months before the murders" that if Julian died, "she would get the money, and if [C.J.] was killed and Julian was dead, she would get that money, too."

Lewis related to Kathy L. Clifton (Clifton), Julian's daughter, that Lewis waited until 45 minutes after the murders before contacting anyone. According to Lewis, she placed telephone calls to her ex-mother-in-law, Marie Bean, and to her friend, Debbie Yeatts, before she "called 911 for help."

After the murders, but before the funeral, Lewis had made a number of statements in Clifton's presence to the effect that Lewis had ample money to pay for the funerals. Clifton also heard Lewis state that she would benefit financially because of the deaths of Julian and C.J.

12

Less than one week after the murders, Lewis attempted to withdraw $50,000 from Julian's account with Prudential Securities. Lewis appeared at a bank and presented a check, purportedly signed by Julian and made payable to her in the amount of $50,000. A bank employee refused to negotiate the check because the signature on the check did not match Julian's signature in the bank's records.

Sheriff's deputies later searched the mobile home where Shallenberger and Fuller resided. Two shotguns were recovered from the residence and delivered to a forensic science laboratory for analysis. According to the laboratory analysis, the shotgun shells recovered from the room where Julian was murdered were fired by one of the shotguns seized from the mobile home where Shallenberger and Fuller lived.

While searching the mobile home occupied by Shallenberger and Fuller, the deputies also found two pair of rubber gloves in a closet in Shallenberger's bedroom. The gloves later were determined to have a primer residue on them as a result of the discharge of a firearm bullet or shell.

A medical examiner performed autopsies on the bodies of Julian and C.J. She determined that each man died as a direct result of multiple shotgun wounds and extensive blood loss. According to the medical examiner, C.J.'s injuries caused rapid

13

death, while Julian survived for about one hour after he was shot.

At the sentencing hearing, Lewis' counsel presented the following evidence. Eddie Rojas, Lewis' probation officer who began supervising Lewis in 2000 after she was convicted of forgery of a drug prescription, testified that Lewis had complied with the terms of her probation and that she had never demonstrated any type of violence. Bruce W. Hammock, Lewis' sister's fiancé and family friend for many years, also testified that he had never seen Lewis behave violently.

Lewis' counsel also introduced a letter from an official at Lewis' place of imprisonment, which advised that Lewis had not received any adverse disciplinary reports during her five months of incarceration. Finally, Lewis' counsel told the circuit court that Lewis' father, brother, and sister were present and would "testify that they love[d] [Lewis] and care about her, and they don't want her to die," but that the family members did not need to testify because "the court's used to that kind of testimony."

The circuit court found that Lewis' conduct was outrageously or wantonly vile, horrible, or inhuman, and sentenced her to death for both capital murder for hire offenses. The circuit court stated that the defendant's sentences of death were based upon the statutory vileness

14

predicate because her acts reflected a depravity of mind. The circuit court also concluded that Shallenberger and Fuller had committed aggravated batteries upon each victim, and that those aggravated batteries were imputed to Lewis.

## II. STANDARD OF REVIEW

When a circuit court submits findings of fact after our certification of issues for an evidentiary hearing under Code § 8.01-654(C), we are bound by such findings resolving disputed issues of fact unless those findings are plainly wrong or are not supported by the evidence. Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003); Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002). However, the circuit court's recommended conclusions of law submitted under Code § 8.01-654(C) are subject to our de novo review. See id.

## III. HABEAS HEARING

At the habeas hearing, Lewis presented evidence regarding counsel's alleged failure to provide effective assistance both before and during her trial. The issues that we address in this opinion involve trial counsel's conduct related to 1) their decisions concerning the investigation and presentation of mitigation evidence for Lewis' sentencing hearing, and 2) their advice to Lewis that she plead guilty.

A. EVIDENCE ON MENTAL RETARDATION & FUNCTIONAL ABILITIES

15

The Commonwealth presented the testimony of Leigh D. Hagan, Psy.D., a forensic and clinical psychologist, who evaluated Lewis based on a personal interview and on his review of Lewis' records. According to Dr. Hagan, Lewis does not meet the criteria for mental retardation established in Code § 19.2-264.3:1.1.

As part of his evaluation, Dr. Hagan administered the same intelligence test that Lewis had been given during the earlier assessment of her competency to stand trial. Dr. Hagan reported that Lewis obtained a full scale I.Q. test score of 70, a performance I.Q. test score of 74, and a verbal I.Q. test score of 72. After considering Lewis' various achievements during her life, Dr. Hagen concluded that these I.Q. test scores represented an "underestimate" of Lewis' intellect, and that she had not put forth her best effort during the I.Q. test.

Dr. Hagan provided examples of Lewis' "adaptive functioning," which he stated supported his conclusion that Lewis was not mentally retarded. Dr. Hagen noted that Lewis had never failed a grade level at school, and had not been terminated from any job due to an inability to understand her employment duties. Lewis also had demonstrated the conceptual ability to respond and attend to her parents' needs, and she had successfully completed a certified nursing assistant program at a local community college.

In addition, Dr. Hagan reported that Lewis was a "prolific" writer during her incarceration, frequently sending letters to various "pen pals" and trial counsel. According to Dr. Hagan, Lewis also planned and appeared for cosmetic appointments while incarcerated in preparation for her court appearances. Based on these observations, Dr. Hagan opined that Lewis had the capacity to act intentionally to plan and help execute the crimes and to attempt to profit from the murders.

Philip R. Costanzo, Ph.D., a psychologist retained by Lewis' habeas counsel to assist in the habeas proceedings, testified that he "could not rule out mental retardation" based on Lewis' academic performance, her inconsistent employment history, and her many short-term relationships with men. Although Dr. Costanzo stated that Lewis had an intellect equivalent to that of a 12 or 13 year old, he admitted that members of his profession have discredited this type of assessment for more than 80 years. Dr. Costanzo also opined that Lewis did not have the mental ability to autonomously initiate or lead the planning and execution of the murders.

Other witnesses described Lewis' abilities to plan, lead, and implement various actions. Deborah T. Grey, a licensed clinical social worker retained by Lewis' habeas counsel to perform a "mitigation analysis," testified that numerous people

17

she interviewed reported that Lewis had "difficulty planning beyond the next day."

Grey also reported that Lewis attended six different schools before she reached the seventh grade and that she did not advance beyond the tenth grade. Grey stated that Lewis held 49 jobs over a period of 14 years and repeatedly had difficulty maintaining consistent attendance at work.

Jonathon D. Presley, a former boyfriend of Lewis, testified that Lewis was a good friend, was "good to [Lewis'] mother," and was never violent. Presley also testified, however, that Lewis was not an organized person, and that she lived "in the moment."

Other witnesses reported that Lewis was a helpful person who was capable of completing household chores, "running errands," and cooking. Melvin C. Wilson, Sr. (Wilson), Lewis' father, testified that Lewis helped her mother in many ways when her mother was ill, including cooking for her parents, bathing her mother, cleaning the house, and taking her mother to doctor's appointments. Family members confirmed that Lewis was her mother's primary caregiver for a period of time before her mother died.

Elinore F. McCance-Katz, M.D., Ph.D., a psychiatrist whose practice involves issues related to different types of addiction, testified at the habeas hearing about Lewis' mental condition around the time of the murders. After interviewing

Lewis and reviewing her various records, Dr. McCance-Katz concluded that although Lewis has a low level of intellectual functioning, she is not mentally retarded.

According to Dr. McCance-Katz, Lewis suffered from prescription drug addiction at the time of the murders, and exhibited impulsivity and a dependent personality. Dr. McCance-Katz further opined that based on Lewis' additional problems with drugs and alcohol, it is unlikely that she had the ability to be a "leader" in the murders of her husband and stepson. Dr. McCance-Katz admitted, however, that Lewis' conduct around the time of the murders was deliberate and "goal-directed," and was not affected by her use of prescription drugs.

B. EVIDENCE OF DEPENDENT PERSONALITY DISORDER

Several of Lewis' friends and family members testified at the habeas hearing that Lewis constantly sought the attention of men. A number of witnesses also stated that Lewis had a strong desire to please others and allowed men to "take advantage" of her.

Dr. Haskins also testified at the habeas hearing. In her capacity as a mental health expert assisting Lewis on the several felony charges at trial, Dr. Haskins had prepared a lengthy report for Lewis' trial counsel. The report included historical information regarding Lewis' development, education,

employment, legal background, family, medical treatment, and drug use.

Dr. Haskins testified that, at the time of trial, she reported to trial counsel that she lacked "adequate information to confidently state" that Lewis met the criteria for dependent personality disorder. However, Dr. Haskins did indicate to trial counsel that Lewis had traits of a dependent personality. After reviewing additional information contained in Grey's mitigation report, Dr. Haskins testified at the habeas hearing that Lewis did meet the criteria for dependent personality disorder.

Dr. Costanzo also opined that Lewis suffered from dependent personality disorder. He stated that Lewis met six of the eight criteria for the disorder, including that she had trouble making decisions on her own, difficulty expressing disagreement with others, and difficulty initiating projects because of a lack of self-confidence.

In contrast, Dr. Hagan concluded that Lewis did not suffer from dependent personality disorder. According to Dr. Hagan, Lewis had dependent personality traits, but these traits did not rise to the level of a disorder.

Thomas M. Blaylock, trial counsel for Lewis, testified that the facts of Lewis' case demonstrated that Lewis took several independent steps to plan the murders and to attempt to collect

20

money after the murders.  Thus, Blaylock concluded that an argument raising Lewis' potential personality disorder would have been unsuccessful at trial.

### C.  EVIDENCE OF PRESCRIPTION DRUG ABUSE

Dr. Louis Eliacin, a gynecologist, treated Lewis for 15 years.  He testified that he performed four surgeries on Lewis and prescribed pain medication to relieve various problems Lewis had related to ovarian cysts and endometriosis.

According to Dr. Eliacin, at some point during his treatment of Lewis, he determined that Lewis was addicted to pain medication, and he recommended that she seek help for her addiction.  Dr. Eliacin's medical records showed that on October 1, 2002, a staff member in his office informed Lewis that Dr. Eliacin would no longer prescribe pain medication for her.

Grey testified that Lewis had a long history of medical problems, including various surgeries and diagnoses of anxiety and depression.  Grey, a certified substance abuse counselor, opined that Lewis was addicted to prescription medication. According to Grey, her review of Lewis' pharmaceutical and medical records from 2002 showed that four doctors simultaneously prescribed narcotics for Lewis.  Grey also determined that during this time period, in addition to narcotics, Lewis also used a variety of other "mind and mood

21

altering medications," including muscle relaxants, sedatives, and antidepressants.

Several witnesses reported that Lewis took pain medications prescribed for other persons, including family members, a friend, and Julian. Lewis' father and sister both stated that Lewis often took too much pain medication and that, when she did this, her speech was slurred, she did not "act herself," and she talked "out of her mind." According to Lewis' sister, Cynthia D. W. Sams, Lewis' behavior was affected by her overuse of pain medication in the fall of 2002. Lewis' father, Wilson, testified that he witnessed Lewis two days before the murders acting as if she had taken too many pills.

Dr. McCance-Katz opined that Lewis had been severely addicted to a variety of medications and to alcohol. This conclusion was based on her interview with Lewis and a review of Lewis' pharmaceutical records. Relying on these sources, Dr. McCance-Katz determined that as of October 15, 2002, Lewis was taking migraine headache medication and narcotics, and that these drugs generally impair a person's thinking, reasoning, judgment, and concentration. Dr. McCance-Katz concluded that the large amounts of medications Lewis was taking around the time of the murders could have caused her to appear "uncaring" and have little expression.

Dr. Haskins testified that at the time of her assessment of Lewis' competency to stand trial, she had concluded that Lewis had a "narcotic dependence." David A. Furrow, also trial counsel for Lewis, acknowledged that he and Blaylock knew about Lewis' prescription drug abuse. Furrow explained, however, that no evidence showed that Lewis was under the influence of drugs at the time of the offenses, and that Lewis denied taking any drugs during that time. Lewis also had told police during the videotaped interview that she had disposed of her pain medication before the time of the murders. According to Blaylock, in his experience trying capital murder cases, he had "never seen success with people using [the excuse that] I was taking drugs voluntarily and therefore I should be excused for committing murder."

Dr. Hagan testified that the evidence was insufficient to conclude that Lewis suffered from drug addiction. Dr. Hagan noted in his report that to the extent Lewis was abusing prescription medication, that abuse did not cause any "extreme mental or emotional disturbance." In addition, according to a nurse from the jail where Lewis initially was incarcerated, Lewis made no medical complaints of drug withdrawal or other symptoms during her stay in the jail from the beginning of November 2002 through December 2002.

D.  TRIAL COUNSEL'S ADVICE ABOUT GUILTY PLEA

Furrow testified that counsel wrote Lewis a letter regarding the issue whether she should plead guilty and later met with Lewis and discussed "every aspect" of Lewis' decision to enter a guilty plea.  Furrow also testified that he explained to Lewis the possible mitigation evidence they could present during the penalty phase of trial.  Furrow acknowledged that he did not explain to Lewis that if she were mentally retarded she would not be subject to the death penalty, because he had no reason to conclude that Lewis was mentally retarded.  Blaylock testified that Lewis understood everything counsel explained to her with regard to her choice whether to plead guilty.

IV.  DISCUSSION

Lewis argues that her trial counsel provided ineffective assistance of counsel.  Lewis contends that trial counsel 1) failed to adequately investigate and present mitigation evidence; and 2) failed to adequately advise Lewis on her decision whether to plead guilty.

We consider Lewis' claims under established principles and first review her assertion that trial counsel were ineffective in their investigation and presentation of mitigation evidence. A defendant's right to counsel under the Sixth Amendment includes the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86 (1984); see

24

Yarborough v. Gentry, 540 U.S. 1, 5 (2003); Roe v. Flores-Ortega, 528 U.S. 470, 476 (2000); United States v. Cronic, 466 U.S. 648, 654 (1984); West v. Director, Dep't of Corrections, 273 Va. 56, 62, 639 S.E.2d 190, 194 (2007); Yarbrough v. Warden, 269 Va. 184, 196, 609 S.E.2d 30, 36 (2005).  Under this guarantee, a defendant is entitled to counsel who is reasonably competent and who gives advice that is within the range of competence required of attorneys in criminal cases.  Strickland, 466 U.S. at 687; see Wiggins v. Smith, 539 U.S. 510, 521 (2003); Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); West, 273 Va. at 62, 639 S.E.2d at 194; Yarbrough, 269 Va. at 196, 609 S.E.2d at 37.

The issue whether counsel provided effective assistance at trial presents a mixed question of law and fact.  Strickland, 466 U.S. at 698; see Yarbrough, 269 Va. at 198, 609 S.E.2d at 38.  To prevail on a claim of ineffective assistance of counsel, a petitioner must ordinarily satisfy both parts of the two-part test set forth in Strickland.  Strickland, 466 U.S. at 687; see Wiggins, 539 U.S. at 521; Williams v. Taylor, 529 U.S. 362, 390 (2000); West, 273 Va. at 62, 639 S.E.2d at 194; Yarbrough, 269 Va. at 196, 609 S.E.2d at 37.

The petitioner first must show that "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 687-88; see also

25

*Wiggins*, 539 U.S. at 521; *Bell v. Cone*, 535 U.S. 685, 695 (2002); *Williams*, 529 U.S. at 390-91; *West*, 273 Va. at 62, 639 S.E.2d at 194.  In making this determination, the court considering the habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689; *see also Kimmelman*, 477 U.S. at 381; *Darden v. Wainwright*, 477 U.S. 168, 185-86 (1986); *West*, 273 Va. at 62, 639 S.E.2d at 194; *Yarbrough*, 269 Va. at 196, 609 S.E.2d at 37.

To show that counsel's conduct fell outside the range of reasonable professional assistance, a petitioner must overcome the presumption that under the particular circumstances presented, the challenged actions may be considered sound trial strategy.  *Strickland*, 466 U.S. at 689; *Yarbrough*, 269 Va. at 196, 609 S.E.2d at 37; *Lovitt*, 266 Va. at 249, 585 S.E.2d at 820; *see Yarborough*, 540 U.S. at 8; *Bell*, 535 U.S. at 698; *Darden*, 477 U.S. at 186.  However, "'strategic choices made after less than complete investigation are reasonable' precisely to the extent that 'reasonable professional judgments support the limitations on investigation.' "  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91); *Yarbrough*, 269 Va. at 196, 609 S.E.2d at 37; *see also Burger v. Kemp*, 483 U.S. 776, 794 (1987).

26

With respect to the investigation and presentation of mitigation evidence, the Supreme Court observed in Wiggins that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at 532; Yarbrough, 269 Va. at 197, 609 S.E.2d at 37.

Instead, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable. Wiggins, 539 U.S. at 523; Strickland, 466 U.S. at 690-91; Yarbrough, 269 Va. at 197, 609 S.E.2d at 37. When making this assessment, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527; see also Yarbrough, 269 Va. at 197, 609 S.E.2d at 37.

If counsel's performance is found to have been deficient under the first part of the Strickland test, to obtain relief the petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the

27

result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 390-91; Yarbrough, 269 Va. at 197-98, 609 S.E.2d at 37; Lovitt, 266 Va. at 250, 585 S.E.2d at 821.

A reviewing court, however, is not required to determine whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697; see also Yarbrough, 269 Va. at 197, 609 S.E.2d at 37; Lovitt, 266 Va. at 250, 585 S.E.2d at 821.

The reviewing court must make its prejudice determination by considering the totality of evidence before the trier of fact.  Strickland, 466 U.S. at 695; see Kimmelman, 477 U.S. at 381.  Further, when a prejudice determination concerns the failure to pursue the presentation of mitigation evidence, the reviewing court must evaluate the totality of the available mitigation evidence, both that adduced at trial and that presented at the habeas hearing that should have been presented at trial.  Wiggins, 539 U.S. at 536; Williams, 529 U.S. at 397-

28

98; Yarbrough, 269 Va. at 198, 609 S.E.2d at 38; Lovitt, 266 Va. at 250, 585 S.E.2d at 821.

In the present case, Lewis alleges that trial counsel provided ineffective assistance because they failed to present available mitigation evidence during the penalty phase of her trial. Lewis contends that counsel should have presented evidence to rebut the Commonwealth's theory that Lewis was the "mastermind" of the murder conspiracy. According to Lewis, her low mental functioning, prescription drug addiction, and dependent personality disorder rendered her incapable of acting with a "depraved mind" because these problems impacted her ability to function and exercise judgment, resist demands, and display emotions. Lewis argues that if counsel had presented this evidence, there is a reasonable probability that Lewis would have been sentenced to life in prison rather than to death.

In addressing these allegations, as recommended by the Supreme Court in Strickland, we move directly to consider the second prong of the two-part test, namely, the issue whether Lewis suffered prejudice sufficient to undermine confidence in the outcome of the proceedings as a result of her counsel's alleged failure to investigate and present certain available mitigation evidence. See Strickland, 466 U.S. at 694; Williams, 529 U.S. at 391, Yarbrough, 296 Va. at 198, 609 S.E.2d at 38;

29

<u>Lovitt</u>, 266 Va. at 252, 585 S.E.2d at 822. We conduct our prejudice analysis without any deference to the circuit court's recommended conclusions of law, because this issue is subject to our de novo review. <u>Yarbrough</u>, 296 Va. at 198, 609 S.E.2d at 38; <u>Lovitt</u>, 266 Va. at 229, 585 S.E.2d at 808; <u>Hedrick</u>, 264 Va. at 496, 570 S.E.2d at 847; <u>see</u> <u>Strickland</u>, 466 U.S. at 698. Further, because we proceed solely under the prejudice prong of <u>Strickland</u>, we review all the evidence in the trial and habeas records and do not rely on the circuit court's findings of fact. See <u>Wiggins</u>, 539 U.S. at 536.

In determining prejudice, we "reweigh the evidence in aggravation against the totality of available mitigation evidence." <u>Wiggins</u>, 539 U.S. at 534; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 397-98; <u>Yarbrough</u>, 269 Va. at 200, 609 S.E.2d at 39; <u>Lovitt</u>, 266 Va. at 256, 585 S.E.2d at 824-25. The evidence in aggravation of Lewis' crimes included her extensive planning of the crimes in which Lewis recruited the killers, paid them $1,200 to purchase weapons, arranged sexual activities for them involving both Lewis and her 16 year old daughter, and assisted the killers' entry into the marital home at night.

Lewis committed the crimes because of greed, intending to profit from the murders by receiving the proceeds from C.J.'s life insurance policy and additional assets held by Julian. Other evidence in aggravation of the murders was Lewis'

diversionary conduct with her husband on the night of the murders, including her act of praying with him before they retired for the night.

The brutal nature of the murders, in which Lewis' husband and stepson were shot several times, was further evidence in aggravation of the crimes. Also, after Shallenberger shot Julian, Lewis went into the bedroom while he was alive and lay bleeding and removed Julian's wallet in order to provide additional money to the killers.

Other powerful evidence in aggravation of the murders was the fact that Lewis waited at least 45 minutes, while her husband was alive and suffering from the multiple bullet wounds, before she contacted emergency response personnel by telephone. When the emergency response personnel arrived and attempted to assist the victims, one of whom was still alive, Lewis engaged in a telephone conversation with a friend discussing C.J.'s alleged failure to lock the back door of the home.

The totality of the available mitigation evidence included information and assessments concerning Lewis' mental functioning, dependent personality issues, drug use, employment history, and general background. On the issue of mental retardation, Lewis was unable to present any witnesses who would opine that she met the definition of "mentally retarded" set forth in Code § 19.2-264.3:1.1.

31

With regard to the issue of Lewis' mental functioning, the evidence was disputed concerning her cognitive ability to plan the murders. Although Dr. Costanzo and Dr. McCance-Katz opined that it was highly unlikely that persons with Lewis' level of mental functioning could plan the murders, Dr. Hagan testified that Lewis had the mental capacity to plan the murders with Shallenberger and to help execute the ultimate plan they devised. Also, Dr. McCance-Katz acknowledged that Lewis' behavior around the time of the murders was purposeful and "goal-directed."

The mitigation evidence on the issue whether Lewis suffered from a dependent personality disorder also was in dispute. Dr. Costanzo and Dr. Haskins concluded that Lewis suffered from a dependent personality disorder. Dr. Costanzo explained that as a result of this disorder, Lewis experienced many problems, including trouble making ordinary decisions without the advice of others, a difficulty initiating activities on her own, and a need for other people to assume responsibility for most major aspects of her life.

Dr. Hagan, however, gave contrary testimony that Lewis did not suffer from such a personality disorder but exhibited conduct that showed "a passive aggressive or an aggressive dependency." According to Dr. Hagan, these characteristics involved the use of other people to achieve one's objectives.

32

With regard to Lewis' drug use, Dr. McCance-Katz testified that Lewis had a severe addiction to drugs and that the amount of narcotic medications she was taking during the time of the murders would have impaired her cognition and inhibited the "affect" or expression that she displayed to others. However, Dr. McCance-Katz admitted that Lewis' ability to carry out the murder plans was not affected by her use of prescription drugs.

Dr. Eliacin and Deborah Grey also concluded that Lewis was addicted to prescription drugs. In addition, Dr. Haskins testified that Lewis had a dependence on narcotics.

In contrast, Dr. Hagan testified that "there is not sufficient eyewitness, third party report, nor evidence of record to support the conclusion that she was actually addicted." Further, Lewis had not complained of any problems associated with drug withdrawal when incarcerated about one week after the murders.

This evidence concerning Lewis' prescription drug abuse is evidence of a type that the Court in Wiggins termed "double edge[d]." See Wiggins, 539 U.S. at 535. While Lewis presented evidence at the habeas hearing that her abuse of narcotics and other prescription drugs could have affected her judgment and have caused her to appear "uncaring" at the time of the offenses, the evidence also showed that, initially, Lewis voluntarily consumed excessive prescription drugs. Therefore,

33

this evidence could be viewed both in aggravation and mitigation of the offense.  See Burger, 483 U.S. at 793-94; Darden, 477 U.S. at 186-87; Lovitt 266 Va. at 257, 585 S.E.2d at 825.

On the subject of Lewis' employment history and general background, the mitigation evidence was undisputed that Lewis had held 49 different jobs during a 14 year period and that she had exhibited kindness to others, particularly to her sick and dying mother.  The evidence also was undisputed that Lewis did not have a history of violent behavior.

The several witnesses who testified concerning the available mitigation evidence thus described various problems Lewis faced as a result of her personality deficits, drug dependence, and level of intellectual functioning.  This testimony, however, did not satisfy Lewis' burden of proof in the present proceedings.  The evidence in aggravation of the offenses, when weighed against the totality of the available mitigation evidence, showed that notwithstanding the various difficulties Lewis experienced over the course of her life, she killed her two relatives solely for monetary gain in a deliberately planned and executed scheme.  Any psychological, cognitive, and physical difficulties Lewis may have had could not explain or even mitigate the carefully calculated conduct that Lewis exhibited in carrying out these crimes.

Accordingly, upon our review of the evidence in mitigation and aggravation of the offenses pursuant to the holding in Wiggins, we conclude that Lewis has failed to demonstrate that her defense was prejudiced by trial counsel's failure to investigate and present the available mitigation evidence introduced at the habeas hearing. We hold that the record does not demonstrate that, but for trial counsel's alleged failures, there is a reasonable probability that the result of the proceedings would have been different.[4] See Strickland, 466 U.S. at 694, see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Yarbrough, 269 Va. at 202, 609 S.E.2d at 40; Lovitt, 266 Va. at 257, 585 S.E.2d at 825.

In a related argument, however, Lewis asserts that trial counsel provided ineffective assistance regarding her decision to plead guilty because counsel failed to adequately advise Lewis about the mitigating evidence that could be presented on her behalf. In addition, Lewis argues that trial counsel improperly failed to inform her that if she were deemed mentally retarded, she would not be eligible to receive the death penalty. According to Lewis, these failures adversely affected

_____

[4] Because we hold that Lewis failed to prove that she was prejudiced as a result of her counsel's failure to investigate and present certain available mitigation evidence, we do not address whether counsel's performance was ineffective under Strickland. See Strickland, 266 U.S. at 697; Yarbrough, 269 Va.

her decision to plead guilty and waive her right to a jury trial. Lewis asserts that "but for" counsel's failures in advising her of these matters, she would have pleaded not guilty and demanded a trial by jury. We find no merit in Lewis' argument.

The two-part Strickland test is also applicable when a petitioner challenges her guilty pleas based on a claim of ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Bowles v. Nance, 236 Va. 310, 311-12, 374 S.E.2d 19, 20-21 (1988). When an alleged error of counsel is the failure to investigate or advise a defendant regarding certain evidence that purportedly caused the defendant to plead guilty rather than to stand trial, a defendant must show that there is a reasonable probability that, absent counsel's alleged errors, the defendant would not have pleaded guilty and would have gone to trial. Hill, 474 U.S. at 59.

The determination whether a defendant would have pleaded not guilty involves an inquiry whether it is likely that counsel's knowledge of the additional evidence would have changed counsel's recommendation regarding the defendant's plea. Hill, 474 U.S. at 59. This assessment, in turn, focuses on an evaluation whether the additional evidence that could have been

at 197, 609 S.E.2d at 37; Lovitt, 266 Va. at 250, 585 S.E.2d at 821.

36

presented likely would have changed the outcome of a trial. Hill, 474 U.S. at 59-60. In accordance with Strickland, such an assessment of the outcome at a possible trial must be made objectively, without consideration of the peculiarities or habits of a particular decision maker. Hill, 474 U.S. at 59-60; Strickland, 466 U.S. at 695.

In the present case, we hold that the habeas record does not satisfy Lewis' burden of proving that, if her trial counsel had gathered the available mitigation evidence, counsel would have recommended that Lewis plead not guilty, she would have pleaded not guilty and proceeded to trial, and the outcome of the proceedings likely would have been different. The additional mitigation evidence could not change the fact that Lewis confessed to the crimes, giving a detailed explanation of her extensive role in planning and carrying out the two murders in order to benefit financially. Lewis also had told the police that she was not under the influence of drugs on the night of the murders. She hired the actual perpetrators of the murders, paid them, and assisted them in carrying out the planned murder of her two relatives.

In addition, the Commonwealth could have rebutted the additional mitigation evidence recited above with expert testimony that Lewis did not suffer from a dependent personality disorder, was not addicted to drugs, and had the cognitive

37

ability to plan and execute the murders. Thus, Lewis has failed to establish that if she had been informed of the additional mitigation evidence, she would have pleaded not guilty, proceeded to trial, and a jury hearing this evidence likely would have imposed a lesser sentence.

Our conclusion is not altered by Lewis' additional contention that her plea of guilty was not knowing, voluntary, and intelligent because trial counsel failed to inform her that if a judge or jury were to find her mentally retarded, she would not be eligible for the death penalty. As stated above, Lewis did not present evidence at the habeas hearing that she met the comprehensive definition of "mentally retarded" set forth in Code § 19.2-264.3:1.1. In the absence of such evidence, Lewis was not prejudiced by trial counsel's failure to inform her as part of the decision whether to plead guilty that a finding of mental retardation would preclude the imposition of a death sentence.

Raising another issue concerning mental retardation, Lewis additionally contends that trial counsel provided ineffective assistance because they failed to present evidence of Lewis' mental retardation and because they failed to demand that a jury make a determination of whether Lewis is mentally retarded. The observations we have already made with regard to the issue of

38

mental retardation permit us to dispose of this contention summarily.

Simply stated, because Lewis failed to present evidence at the habeas hearing that she is "mentally retarded," as that term is defined in Code § 19.2-264.3:1.1, her claim that counsel were ineffective for failing to present such evidence and submit the issue for a jury's determination necessarily fails.  The fact that Lewis could have presented evidence to a jury that she met part of the statutory definition of "mentally retarded" is wholly unpersuasive.  A person is not "mentally retarded," within the meaning of Code § 19.2-264.3:1.1, unless that person meets the comprehensive definition of this statutory term. Having failed to do so, Lewis cannot successfully argue that trial counsel were ineffective for failing to present before a jury evidence that did not exist.

Accordingly, we hold that Lewis has failed to demonstrate that but for trial counsel's alleged failures addressed above, there is a reasonable probability that Lewis would have pleaded not guilty and the result of the proceedings would have been different.  See Strickland, 466 U.S. at 694; Hill, 474 U.S. at 59; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Yarbrough, 269 Va. at 202, 609 S.E.2d at 40; Lovitt, 266 Va. at 257; 585 S.E.2d at 825.  In sum, the record before us does not undermine confidence in the outcome of the proceedings.

See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Yarbrough, 269 Va. at 202, 609 S.E.2d at 40; Lovitt, 266 Va. at 257, 585 S.E.2d at 825.

For these reasons, and for the reasons stated in our order decided today addressing additional claims raised by Lewis, we will dismiss the petition for a writ of habeas corpus.

Petition dismissed.