PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TERESA WILSON LEWIS,

     *Petitioner-Appellant,*

v.

BARBARA J. WHEELER, Warden, Fluvanna Correctional Center for Women,

     *Respondent-Appellee.*

No. 09-4

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Glen E. Conrad, District Judge.
(7:07-cv-00538-gec-mfu)

Argued: March 23, 2010

Decided: June 4, 2010

Before TRAXLER, Chief Judge, WILKINSON,
Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Wilkinson and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED**: James Elmer Rocap, III, STEPTOE & JOHNSON, LLP, Washington, D.C., for Appellant. Katherine Bal-

dwin Burnett, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Michele J. Brace, VIRGINIA CAPITAL REPRESENTA-TION RESOURCE CENTER, Charlottesville, Virginia, for Appellant. William C. Mims, Attorney General, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Teresa Wilson Lewis ("Lewis") pleaded guilty in the Circuit Court of Pittsylvania County, Virginia to two counts of capital murder for hire, and related charges of conspiracy to commit capital murder, robbery, and use of a firearm, arising out of the murders of her husband, Julian Clifton Lewis, Jr. ("Julian"), and stepson, Charles J. Lewis ("C.J."). She was sentenced to death for each conviction of capital murder for hire, life imprisonment for the robbery conviction, and a total of 33 years' imprisonment for the remaining convictions.

After unsuccessfully challenging her death sentences on direct appeal and in state habeas proceedings, Lewis filed a petition for a writ of habeas corpus in federal district court. *See* 28 U.S.C.A. § 2254 (West 2006). The district court denied relief but granted a certificate of appealability on four claims. *See* 28 U.S.C.A. § 2253(c)(1) (West 2006). We granted a certificate of appealability on two additional claims. *See id.* For the reasons set forth below, we now affirm.

I.

The detailed facts surrounding the murders of Julian and C.J. are set forth in the opinions of the Virginia Supreme

Court, which we summarize below. *See Lewis v. Warden*, 645 S.E.2d 492, 495-99 (Va. 2007); *Lewis v. Commonwealth*, 593 S.E.2d 220, 222-25 (Va. 2004).

### A.

In March or April 2000, Lewis met Julian at Dan River, Inc., where they were both employed. Julian was a recent widower, having lost his wife and the mother of his three adult children to an extended illness in January of that year. In June 2000, Lewis moved in with Julian. They married soon thereafter and Lewis quit working.

In December 2001, Julian's son, Jason Clifton Lewis, was killed in an accident. Julian received life insurance proceeds in excess of $200,000, which he placed in an account with Prudential Securities that was only accessible by him. In February 2002, Julian purchased five acres of land and a mobile home where he and Lewis began to live.

In August 2002, C.J., an Army reservist, was required to report for active duty with the National Guard. Prior to leaving, C.J. made estate arrangements, including executing a will and obtaining a life insurance policy in the amount of $250,000. He designated Julian as his primary beneficiary and Lewis as his secondary beneficiary.

It was also in the fall of 2002 that Lewis first met Matthew J. Shallenberger ("Shallenberger") and Rodney L. Fuller ("Fuller"), who would become her co-conspirators in a plot to murder her husband and stepson. Lewis met Shallenberger, who was 22 years old, and Fuller, who was 19 years old, at a Wal-Mart store. Before long, Lewis began a sexual relationship with Shallenberger, who was 11 years her junior. On at least one occasion, however, Lewis performed a "lingerie show" for both men, and had sexual intercourse with Fuller as well as Shallenberger. On another occasion, Lewis took her 16-year-old daughter with her to meet the men at a parking

lot. Lewis introduced her daughter to Fuller and the two had sexual intercourse in one car while Lewis and Shallenberger had sexual intercourse in the other vehicle.

At some point, Lewis and Shallenberger began discussing a plan to kill Julian and share the money that Lewis would get upon his death. The first plan was put into motion on October 23, 2002. Lewis withdrew $1,200 from the bank and gave the money to the men to purchase the necessary guns and ammunition. Shallenberger gave the money to an acquaintance who purchased two shotguns for the conspirators. Lewis told Shallenberger and Fuller the route that Julian would travel from work to home that evening. The plan was for the men to stop and kill Julian on the roadway and make the murder look like a robbery. The presence of another vehicle close to Julian during the trip home, however, made execution of the first plan impossible.

Undeterred, the conspirators quickly hatched a second plan to kill Julian. They also added a plan to murder C.J. when he returned home for his father's funeral in order to share the proceeds from his life insurance policy as well. However, when Lewis learned that C.J. would be visiting at the mobile home on the evening of October 29-30, 2002, the decision was made to murder Julian and C.J. at the same time.

In the early morning hours of October 30, 2002, Shallenberger and Fuller, armed with the shotguns purchased with Lewis' money, entered the mobile home through a rear door that Lewis had left unlocked for them. Upon entering, Shallenberger woke Lewis, who had fallen asleep next to Julian while waiting, and told her to get up. She went into the kitchen where she waited while Shallenberger shot Julian several times with the shotgun. She then reentered the bedroom, where Julian lay mortally wounded but still alive, retrieved Julian's pants and wallet, and returned to the kitchen. Meanwhile, Fuller went to C.J.'s bedroom and shot him several times with the second shotgun. When Fuller returned to the

kitchen, he saw Lewis and Shallenberger removing the money from Julian's wallet. Apparently there was some uncertainty as to whether C.J. was dead, so Fuller took Shallenberger's shotgun and returned to shoot C.J. two more times. After retrieving some of the shotgun shells, Shallenberger and Fuller left the mobile home.

For approximately 45 minutes after the last shots were fired, Lewis remained in the mobile home with the victims. She made at least two telephone calls to other persons, but did not call authorities. At approximately 3:55 a.m., a 911 operator fielded a call from Lewis reporting that a single intruder had entered her home at approximately 3:15 or 3:30 a.m., and shot her husband and stepson. She told the 911 operator that the intruder entered the bedroom where she was sleeping with Julian and told her to get up. She claimed that Julian told her to go into the bathroom, where she hid while the intruder fired four or five times.

Sheriff's deputies arrived at the Lewis home at approximately 4:18 a.m. Lewis told the deputies that her husband's body was on the floor in the master bedroom and that her stepson's body was in the other bedroom. When the officers entered the master bedroom, however, they found Julian badly wounded, but still alive and talking. He "'made slow moans' and uttered, 'Baby, baby, baby, baby.'" *Lewis*, 593 S.E.2d at 223 (alteration omitted). Julian told the officers his name and, when asked "if he knew who had shot him, . . . responded, 'My wife knows who done this to me.'" *Id.* at 224. While trying to assist the victims, one deputy observed Lewis talking on the telephone and heard Lewis "state, 'I told C.J. about leaving that back door unlocked.'" *Id.* (alteration omitted). Julian died shortly thereafter, while still in the mobile home. When informed that Julian and C.J. were dead, Lewis did not appear to the officers to be upset.

Investigator Barrett and Investigator Isom with the Pittsylvania County Sheriff's Office interviewed Lewis during

their investigation of the murders. During one interview, Lewis claimed that Julian had physically assaulted her a few days before the murders, but denied killing him, having him killed, or knowing who killed him. Lewis told the investigators that she and Julian had talked and prayed together before he went to bed that night, and that she told him she was going to the kitchen to pack his lunch for the next day. A lunch bag was found in the refrigerator with an attached note stating "'I love you. I hope you have a good day.'" *Id.* She had also drawn a picture of a "smiley face" on the bag and inscribed "'I miss you when you're gone,'" in the smiley face. *Id.*

Later that morning, Lewis called Mike Campbell, Julian's supervisor at Dan River. She told Campbell that Julian had been murdered and asked for Julian's paycheck. Campbell told Lewis that she could pick it up after 4:00 p.m. that day. The following day, Lewis contacted Campbell again, apologized for not picking up the check the day before, and again asked when she could get it. Campbell later testified that Julian brought his lunch to work in a blue and white cooler and did not use lunch bags. He also testified that when he went to pay his respects to Lewis in person a couple of days later, Lewis told him that Julian had bought her a red sports car before he was killed, but that she was going to trade it along with one of his vehicles for a larger car. She also told Campbell that she planned to sell Julian's land and mobile home.

Also on the day of the murders, Lewis spoke with Lieutenant Michael Booker, C.J.'s commanding officer. When Lt. Booker called Lewis to express his condolences, Lewis told him that she was "'still in shock'" and that the police had been questioning her. *Id.* She told Lt. Booker that "[t]here is no way I would have killed my husband and stepson. They guessed that because I didn't get shot that I might have done it. My husband told me to go into the bathroom, so I did." *Id.* Lewis then informed Lt. Booker that she was the secondary beneficiary of C.J.'s military life insurance policy and that she

had been told that she would be contacted within 24 hours of his death with information regarding when she would get her money.

On November 4, 2002, Lewis contacted Lt. Booker and requested C.J.'s personal effects and a photograph of C.J. that she had given Lt. Booker for a memorial service. Lt. Booker told Lewis that he would return the photograph to her, but that the personal effects would be given to C.J.'s sister Kathy Clifton, his immediate next of kin. Lt. Booker testified that Lewis became "very angry" and "insisted that [Lt. Booker] bring them to her as soon as possible." J.A. 99. When Lt. Booker refused, Lewis again asked about the life insurance money and "remind[ed him] that she was the secondary beneficiary." J.A. 99. When Lt. Booker told Lewis that she would still be entitled to the life insurance, Lewis responded, "'that's fine, Kathy can have all of his effects as long as I get the money.'" J.A. 100.

Julian's daughter Kathy also testified about her dealings with Lewis immediately after the murders. Lewis told Kathy that she had waited 45 minutes after the murders to call 911, and that she called her ex-mother-in-law, Marie Bean, and her best friend, Debbie Yeatts, prior to doing so. Lewis also called Kathy on the night of the murders and told her that she had already gone over the necessary arrangements with the funeral home. Lewis told Kathy that all she needed were the names of some of Julian's family members, and that Kathy need not even come to the funeral home the following day. When Kathy joined Lewis at the funeral home the next day anyway, she recalled Lewis saying that "she was the sole beneficiary of everything" and that "money was no object." J.A. 141. On the day of the funerals, Lewis called Kathy prior to the services and told her "that she had just left the hairdresser's and had gotten her nails done, [and] that she had bought a beautiful suit to wear to the funeral." J.A. 141-42. She also offered to sell Julian's mobile home to Kathy.

In addition to her attempts to obtain Julian's paycheck, Lewis also made a quick attempt to withdraw $50,000 from Julian's Prudential Securities' account by presenting a forged check made payable to her at the bank. The bank employee refused to cash the check because the signature did not match Julian's signature in the bank's records.

Finally, and consistent with Lewis's immediate attempts to obtain the cash payoff from the murders, the investigators learned that Lewis was aware prior to the murders that she would handsomely profit from the deaths of her husband and stepson. She had earlier told an acquaintance that she was "just 'using Julian for money and that he would buy her things.'" *Lewis*, 593 S.E.2d at 225. Another acquaintance overheard her saying a couple of months before the murders that "if Julian died, 'she would get the money, and if [C.J.] was killed and Julian was dead, she would get that money, too.'" *Id.*

On November 7, 2002, Lewis, presented with the rapidly accumulating evidence against her, confessed to Investigator Isom that she had offered Shallenberger money to kill Julian. Lewis told Isom that she met Shallenberger at Wal-Mart and let him into their home on the night of the murders. However, she falsely claimed that Shallenberger shot both Julian and C.J. before taking the money and leaving the mobile home. She told Isom that Shallenberger had expected to receive half of the insurance proceeds, but that she had changed her mind and decided to keep all of the money. Lewis then accompanied Isom to Shallenberger's residence, where she identified him as her co-conspirator. The following day, Lewis asked to speak with Isom and admitted that she had not been totally truthful the day before. Lewis confessed Fuller's involvement in the murders and advised Isom that her minor daughter had assisted during the planning process as well. During the ensuing search of the mobile home where Shallenberger and Fuller resided, officers recovered two pairs of rubber household gloves containing primer residue caused by the firing of a

firearm shell and two shotguns, one of which was determined to have fired the shotgun shells found in Julian's bedroom.

According to the autopsies, Julian and C.J. both died as a direct result of the multiple shotgun wounds. Julian was struck in "the upper left arm, shoulder, abdomen, pelvis, penis, thighs, legs, arms, and chest. The bullets destroyed or removed large areas of tissue in his upper arm, shoulder, and upper chest, [and] fractured several ribs." *Id.* In addition, "[p]lastic wadding from a shotgun shell was lodged in [Julian's] left lung tissue." *Id.* However, none of Julian's injuries were immediately fatal, and Julian instead "died from extensive blood loss" approximately 45 minutes to an hour after the shootings. *Id.* C.J. was struck in the "back, abdomen, chest, neck, left upper arm and shoulder, elbow, left thigh, face, and forearm," but died almost immediately from his wounds. *Id.*

B.

Shortly after Lewis was charged for her participation in the murder-for-hire plot, the trial judge appointed attorneys David Furrow and Thomas Blaylock to represent her, both of whom had experience in capital murder cases. After investigating the case, counsel became extremely concerned about the heinous facts surrounding this intimate, murder-for-hire and -profit crime and their dim prospects for preventing a death penalty verdict by a Pittsylvania County jury. Given their knowledge of the assigned trial judge and of juries generally in the county, they became convinced that Lewis' best chance of avoiding the death penalty would be to submit to sentencing by the trial judge, who had never imposed the death penalty on a capital defendant and who would be sentencing Fuller, a triggerman, to life imprisonment under an agreement he had made with the prosecution for his cooperation against Shallenberger and Lewis.

Under Virginia law, if a defendant pleads guilty to capital murder, the trial judge conducts the sentencing proceeding

without a jury. *See* Va. Code § 19.2-257. If the defendant pleads not guilty, the trial court may determine the case only with the consent of the defendant and concurrence of the Commonwealth. *See id.* Accordingly, counsel recommended that Lewis plead guilty and invoke her statutory right to be sentenced by the trial judge.

Prior to the guilty plea proceeding, a competency assessment of Lewis was performed by Barbara G. Haskins, M.D., a board-certified forensic psychiatrist, who also arranged for an IQ test to be performed by Dr. Bernice Marcopulos. According to the testing, Lewis had a Full Scale IQ of 72, with a Verbal IQ of 70, and a Performance IQ of 79. This placed her in the borderline range of intellectual functioning, but not at or below the level of mental retardation. Dr. Haskins reported that Lewis was competent to enter the pleas and able to understand and appreciate the possible penalties. At the guilty plea proceeding, the trial judge questioned Lewis and ensured that she understood that she was waiving her right to a jury and that she would be sentenced to either life imprisonment or death by the trial judge. Satisfied that Lewis was entering the plea voluntarily, knowingly, and intelligently, the trial judge accepted the plea and scheduled the sentencing proceeding.

At the sentencing proceeding, the Commonwealth relied primarily upon a written summary of evidence that would have been presented against Lewis had the case proceeded to a jury trial, and sought the death penalty based upon Virginia's statutory aggravating factors of vileness (based upon both depravity of mind and aggravated battery to the victims) and future dangerousness.[1] In mitigation, the defense presented

---

[1]*See* Va. Code Ann. § 19.2-264.2 (providing that "[i]n assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant

evidence that Lewis had no previous history of violence and had only a single, non-violent conviction for prescription forgery for which she was on probation. Lewis' probation officer testified that Lewis had been compliant with the terms of her probation and had never demonstrated any type of violence. The probation officer who prepared the presentence report also testified that Lewis seemed remorseful when he interviewed her. A long-time family friend and schoolmate of Lewis', who was engaged to be married to Lewis' sister, testified that he had never observed Lewis behaving in a violent manner. Finally, an official at the Roanoke City Jail provided a statement that there had been no incidents of violence involving Lewis, nor even minor infractions while she was incarcerated there awaiting trial. Lewis' father, brother and sister were in the courtroom during the sentencing, and the trial judge was advised that they would all testify that they loved and cared about Lewis and did not want her to receive the death penalty.

At the conclusion of the sentencing proceeding, the trial judge rejected the future dangerousness aggravator, based upon the lack of any significant criminal history or violent behavior. However, he imposed sentences of death for the capital offenses based upon the vileness aggravator, finding that Lewis' conduct involved both depravity of mind and aggravated battery. *See Lewis*, 593 S.E.2d at 227 (noting that "[a] finding of vileness must be based on conduct which is outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. Proof of any one of these three components will

---

would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed); *see also* Va. Code Ann. § 19.2-264.4.

support a finding of vileness." (internal quotation marks and citation omitted)).

In imposing the sentences of death, the trial judge acknowledged that the case was made more difficult by the fact that Lewis had led the police to Shallenberger and Fuller and pleaded guilty to her crimes, as well as by the fact that Fuller would receive a life sentence for his part in the plot. However, the trial judge found that Lewis, as wife and stepmother to the victims, had engaged in the "cold blooded, pityless slaying of two men, horrible and inhumane" for profit, which "fits the definition of the outrageous or wantonly vile, horrible, act." J.A. 213. Of particular significance, the trial judge noted the "cold" lack of emotion displayed by Lewis, J.A. 211, and the fact that there was "no other motivation for these killings except greed" with "no thought on her part of what she was doing other than these two murders and what she would receive once they were deceased," J.A. 212. The trial judge also found it significant that Lewis had "lured [the] men and her juvenile daughter into [her] web of deceit and sex and greed and murder, and within an incredibly short period of time from meeting [the men], she had recruited them, been involved in planning and completing these murders, and within one week before the actual murders had one failed attempt on Julian's life." J.A. 212. Finally, he paid particular note to the fact that, "while her husband lay dying . . . in the bedroom, [Lewis] was out apparently writing a love note to him to put in the refrigerator, splitting up the money from the deceased's wallet with the co-defendants in the kitchen and waiting for Julian to die." J.A. 213. Based upon the evidence, the trial judge was "convinced that [Lewis] waited until she thought [Julian] was dead before she called the police" and "that she allowed him to suffer . . . without any feelings at all, with absolute[ ] coldness." J.A. 217.[2]

---

[2]Later, in connection with Shallenberger's death penalty sentencing phase, the trial judge stated that Lewis was "the most culpable" of the

On appeal, the Virginia Supreme Court affirmed the death sentences, agreeing that "without question," the evidence of Lewis' conduct overwhelmingly supported the trial judge's finding of the vileness aggravator based upon depravity of mind. *Lewis*, 593 S.E.2d at 227; *id.* (explaining that "depravity of mind," for purposes of the vileness aggravator, is defined as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation.") (internal quotation marks omitted). Specifically, the court found that,

> the defendant was the mastermind of these gruesome crimes, which would not have occurred but for her actions. The evidence shows that she married her husband because she was interested in his money. She planned to kill him and her stepson so that she could acquire her husband's assets and proceeds from her stepson's life insurance policy. She made a prior unsuccessful attempt along with Shallenberger and Fuller to kill her husband, and, when that plan failed, she initiated another plan which resulted in the deaths of her husband and her stepson while they lay asleep in their home. She involved her 16-year-old daughter in the plan to kill the victims, and she encouraged her daughter to have sexual relations with one of the murderers. The defendant also paid for the shotguns and ammunition used to kill her husband and stepson.
>
> After Shallenberger and Fuller had shot the victims several times with shotguns, the defendant went

three conspirators, J.A. 313, and referred to her as "the head of th[e] serpent." J.A. 310. The trial judge agreed with the Commonwealth that all three conspirators deserved the death penalty, but felt unable "in good conscience" to sentence Shallenberger to death when "the Commonwealth ha[d] chosen to offer one of the shooters life." J.A. 314.

to her husband's bedroom and took his pants and wallet. She removed cash from her husband's wallet and gave it to the murderers while her husband lay bleeding to death from the wounds that he had suffered. Even then, however, the defendant waited at least 45 minutes, while her husband was still alive, suffering and bleeding from the bullet wounds, before she reported the crimes . . . . Once the deputy sheriffs arrived at the residence, at least one hour after her husband and stepson had been shot, defendant's husband remained alive, suffering and bleeding to death. After her husband's death, the defendant showed no emotion or remorse, and she initially denied any involvement in this murder. Moreover, on the night of the murders, prior to the killings, the defendant prayed with her husband and arranged for her daughter to speak to her husband so that he would not think that something was awry.

*Id.* at 228.[3] Lewis' petition for rehearing was subsequently denied, and the United States Supreme Court denied certiorari. *See Lewis v. Virginia*, 543 U.S. 904 (2004).

## C.

In subsequent state habeas proceedings, Lewis alleged that her counsel, while successful in refuting the future dangerousness aggravator, had been constitutionally ineffective in failing to adequately investigate and present mitigating evidence to also refute the depravity-of-mind aggravator and to otherwise mitigate her crimes. Lewis also asserted, for the first time, constitutional challenges to Va. Code Ann. § 19.2-257,

---

[3]Having concluded that the depravity-of-mind aggravator was overwhelmingly supported by the evidence of record, the Virginia Supreme Court found it unnecessary to address Lewis' challenge to the trial judge's decision to impute the aggravated batteries to Lewis. *See Lewis v. Commonwealth*, 593 S.E.2d 220, 227 (Va. 2004).

and the validity of her guilty plea. Lewis claimed that she had a constitutional right under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), to plead guilty and have the aggravating factors determined by a jury instead of a judge, rendering the statute and her guilty plea constitutionally invalid. Lewis also claimed that counsel was constitutionally ineffective in failing to advise her of this right and preserve it before the trial judge. The Virginia Supreme Court rejected Lewis' ineffective-assistance-of-counsel claims on the merits, and found Lewis' challenges to the statute and guilty plea to be procedurally barred because she had failed to raise them at trial or on direct appeal.

Pursuant to 28 U.S.C.A. § 2254, Lewis then filed a petition for a writ of habeas corpus in the district court, raising the same claims. The district court dismissed Lewis' petition and denied Lewis' motion to alter or amend the judgment.

## II.

We review the district court's denial of federal habeas relief on the basis of a state court record *de novo*. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). However, when a habeas petitioner's constitutional claim has been "adjudicated on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

"A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of th[e] [Supreme] Court." *Thaler v. Haynes*, 130 S. Ct. 1171, 1173 (2010) (per curiam); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("Th[e] statutory phrase refers to the

holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."). A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's. *Williams*, 529 U.S. at 405. A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e] Court's cases but unreasonably applies it to the facts of the particular . . . case." *Id.* at 407. A state court also unreasonably applies federal law when it "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* Factual determinations made by the state court "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1).

### III.

We begin with Lewis' claims that counsel was ineffective in failing to investigate and present additional evidence during the sentencing phase which she contends would have (1) rebutted the Commonwealth's theory that she was the mastermind of the murder conspiracy and that she acted with a depraved mind in planning and executing the murder plot, and (2) otherwise mitigated her crimes by humanizing her, outweighing the aggravating evidence and making her a candidate for mercy.

Such claims of ineffective assistance of counsel are reviewed under the standards of *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and its progeny. Lewis must demonstrate "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687.

To demonstrate inadequate or deficient performance, Lewis "must show that counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Id.* at 688. To demonstrate prejudice, Lewis "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In death penalty challenges, this showing requires a habeas petitioner to establish a reasonable probability that the sentencer, if confronted with the additional mitigating evidence, would have returned a different sentence. *See Wiggins v. Smith*, 539 U.S. 510, 536 (2003); *see also Powell v. Kelly*, 562 F.3d 656, 668 (4th Cir. 2009) ("Under *Strickland*, [the petitioner] must show that 'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" (quoting *Strickland*, 466 U.S. at 695)); *Emmett v. Kelly*, 474 F.3d 154, 160 (4th Cir. 2007) (same).

## A.

The additional evidence relied upon by Lewis in support of her claims was presented at an evidentiary hearing conducted by the original trial judge at the direction of the Virginia Supreme Court, and is extensively discussed both in the Virginia Supreme Court's decision dismissing the state habeas petition, *see Lewis*, 645 S.E.2d at 499-502, and the district court's decision below, *see Lewis v. Wheeler*, 2009 WL 588957 (W.D. Va. Mar. 6, 2009). By way of summary, Lewis obtained and presented additional evidence and opinions from Dr. Haskins and Dr. Marcopulos, as well as new opinions and testimony from Dr. Philip R. Costanzo, Ph.D., a psychologist, Dr. Elinor McCance-Katz, an addiction psychiatrist, and Dr. Louis Eliacin, Lewis' treating gynecologist. Lewis also hired and presented evidence from Ms. Deborah Gray, a social worker and substance abuse counselor who performed a mitigation investigation, and testimony from various family members and acquaintances. Lewis contends that the additional

evidence would have established that she suffered, at the time of the murders, from borderline intellectual functioning, a dependent personality disorder that caused her to latch onto men and be easily led by them, and prescription drug addiction or abuse. The combined effect of these disabilities, she asserts, would have explained her "cold" affect and demeanor and demonstrated her inability to mastermind or otherwise plan the heinous murders.

In response to this additional evidence, the Commonwealth submitted an expert evaluation of Lewis performed by Dr. Leigh D. Hagan, a forensic and clinical psychologist. According to Dr. Hagan, there was insufficient evidence to support the claim that Lewis suffered from an addiction to prescription medications, or that her use of such medications caused an extreme mental or emotional disturbance. In addition, Lewis failed to meet the criteria for a diagnosis of dependent personality disorder. According to Dr. Hagan, Lewis had the capacity to plan and carry out the murder plot.

Lewis' counsel testified at the state habeas hearing regarding their representation and strategy for defending her. They acknowledged that they were aware of Lewis' low IQ, alleged difficulties with prescription drugs, and possible dependent personality traits. However, they believed that further investigation and development was unnecessary and potentially harmful. The low IQ evidence would be placed before the trial judge in the competency report and, in their view, the prescription drug and dependent personality issues were unsupported by the facts and double-edged in character. In addition to opening Lewis up to a potentially damaging evaluation by an expert for the Commonwealth, they believed that the latter two "excuses" would have supported the future-dangerousness aggravator and substantially undercut their strategy to portray her as a previously non-violent defendant who had accepted responsibility for her role in the offense and assisted the authorities in arresting her coconspirators.

After considering the additional evidence, the trial judge found that counsel had employed a reasonable strategy during the sentencing phase and that Lewis had failed to demonstrate either deficient performance or actual prejudice.[4] The Virginia Supreme Court also rejected the claims, but did so solely on the basis of Lewis' failure to demonstrate prejudice. The court concluded that Lewis' alleged problems did "not explain or even mitigate the carefully calculated conduct that [she had] exhibited in carrying out the[ ] crimes." *Lewis*, 645 S.E.2d at 506. Because there was no reasonable probability that, had the evidence been presented in the original sentencing proceeding, the trial judge would have imposed a sentence of life imprisonment instead of death, Lewis was not entitled to relief. *See id.*

B.

Lewis first contends that § 2254(d)'s deferential standards of review do not apply to her claim that counsel was ineffective in failing to present the additional evidence to rebut the depravity-of-mind aggravator and, consequently, that we must

---

[4]Specifically, the trial judge found that counsel had "made reasonable and proper choices based on the information supplied by the defendant, statements of witnesses, her own experts, and the real evidence against [Lewis]." J.A. 2270-71. The judge also found that counsel had made "reasonable decisions not to present or investigate further certain evidence that while it may have gone to the defense of depravity of mind was a double edged sword that would also have supported the aggravator of future dangerousness." J.A. 2271. The trial judge further found that "[t]he evidence in th[e] case belied [Lewis]'s attempts to present herself as mentally deficient and dependent such that she was incapable of planning and carrying to execution the two murders," and that "[n]one of the experts testifying overcame the evidence in th[e] case that [Lewis] planned, directed and saw to finality these two murders, and her attempts, and her attempts only, to profit from the[m]." J.A. 2271. The trial judge found that counsel's strategy to focus the mitigation evidence on the future dangerousness aggravator was a reasonable one and that the "decision to avoid presenting or investigating further the double edged evidence under the depravity of mind vileness factor was also objectively reasonable." J.A. 2272.

review this claim *de novo*. *See Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009) (providing that a claim that has not been adjudicated on the merits by the state court will be reviewed by the federal court *de novo*); *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) (same). She contends that the state habeas court was required to consider whether there was a reasonable probability that the trial judge would have rejected the depravity-of-mind aggravator prior to considering whether there was a reasonable probability that the trial judge would have found that the totality of the mitigating evidence outweighed that aggravator. We disagree.

First, although Lewis states her claims as two separate ones, the evidentiary basis for the two claims is the same. Moreover, both claims necessarily involve considering the aggravating circumstances surrounding the crime in light of the evidence presented in the habeas hearing to rebut (or, in the alternative, mitigate) those aggravating circumstances. Lewis contends that counsel's failure to present the additional evidence of her disabilities amounted to deficient performance. She contends that she was prejudiced because there is a reasonable probability that, had the evidence been presented, she would have received a sentence of life imprisonment *either* because (1) the judge would have rejected the vileness predicate based upon depravity of mind, or (2) the judge would have found that the totality of the mitigating evidence sufficiently outweighed the aggravating circumstances of the murders. In short, Lewis asserts identical claims of deficient performance and prejudice, but alternative arguments for why the outcome of her sentencing proceeding might have been different. Under these circumstances, we see nothing improper or unreasonable in the Virginia Supreme Court's joint consideration of the claims.

Second, the Virginia Supreme Court clearly appreciated the separately stated claim challenging counsel's failure to present the evidence to rebut the depravity-of-mind aggravator, explicitly noting that:

In the present case, Lewis alleges that trial counsel provided ineffective assistance because they failed to present available mitigation evidence during the penalty phase of her trial. Lewis contends that counsel should have presented [this] evidence to rebut the Commonwealth's theory that Lewis was the "mastermind" of the murder conspiracy. According to Lewis, her low mental functioning, prescription drug addiction, and dependent personality disorder rendered her incapable of acting with a "depraved mind" because these problems impacted her ability to function and exercise judgment, resist demands, and display emotions.

*Lewis*, 645 S.E.2d at 504 (emphasis added). Thus, while the court generally referred to the additional evidence as "mitigation evidence," it clearly considered Lewis' claims that this evidence would have both rebutted the depravity-of-mind aggravator and otherwise served to mitigate her crimes.

Finally, the Virginia Supreme Court, after weighing the evidence in aggravation against the totality of the mitigating evidence, held that "[a]ny psychological, cognitive, and physical difficulties Lewis may have had could not explain or even mitigate the carefully calculated conduct that Lewis exhibited in carrying out these crimes." *Id.* at 506. We think the only fair reading of the opinion is that the court considered both claims but concluded that Lewis was not entitled to habeas relief because she had both (1) failed to demonstrate that the alleged deficiencies rebutted, or "explain[ed] . . . the carefully calculated conduct" upon which the depravity-of-mind aggravator rested and (2) failed to demonstrate that these identical alleged deficiencies would have "even mitigate[d]" that conduct in the balance. *Id.*

Accordingly, we hold that the Virginia Supreme Court properly considered the claims and adjudicated them on the

merits, and that our review of its decision is therefore subject to the deferential standards of review set forth in § 2254(d).

C.

Turning to the merits of Lewis' ineffective-assistance-of-counsel claims, we cannot say that the state court's adjudication was an unreasonable one given the evidence presented.

The crux of Lewis' claims is that the additional evidence would have demonstrated that she was incapable of serving as the mastermind of the murder conspiracy, explained her cold affect and demeanor, and otherwise mitigated her involvement in the murders. The Virginia Supreme Court, after obtaining the findings and recommendations of the trial judge, evaluated all of the evidence presented both in the original and state habeas hearings and concluded that Lewis had failed to demonstrate that there was a reasonable probability that the outcome of her sentence would have been different had the additional evidence been presented. *Id.* at 506. According to the court:

> The evidence in aggravation of Lewis' crimes included her extensive planning of the crimes in which Lewis recruited the killers, paid them $1,200 to purchase weapons, arranged sexual activities for them involving both Lewis and her 16 year old daughter, and assisted the killers' entry into the marital home at night.
>
> Lewis committed the crimes because of greed, intending to profit from the murders by receiving the proceeds from C.J.'s life insurance policy and additional assets held by Julian. Other evidence in aggravation of the murders was Lewis' diversionary conduct with her husband on the night of the murders, including her act of praying with him before they retired for the night.

The brutal nature of the murders, in which Lewis' husband and stepson were shot several times, was further evidence in aggravation of the crimes. Also, after Shallenberger shot Julian, Lewis went into the bedroom while he was alive and lay bleeding and removed Julian's wallet in order to provide additional money to the killers.

Other powerful evidence in aggravation of the murders was the fact that Lewis waited at least 45 minutes, while her husband was alive and suffering from the multiple bullet wounds, before she contacted emergency response personnel by telephone. When the emergency response personnel arrived and attempted to assist the victims, one of whom was still alive, Lewis engaged in a telephone conversation with a friend discussing C.J.'s alleged failure to lock the back door of the home.

*Id.* at 504-05. The evidence developed by Lewis to rebut and/or mitigate these aggravating circumstances, on the other hand, was determined to be comparatively weak:

With regard to the issue of Lewis' mental functioning, the evidence was disputed concerning her cognitive ability to plan the murders. Although Dr. Costanzo and Dr. McCance-Katz opined that it was highly unlikely that persons with Lewis' level of mental functioning could plan the murders, Dr. Hagan testified that Lewis had the mental capacity to plan the murders with Shallenberger and to help execute the ultimate plan they devised. Also, Dr. McCance-Katz acknowledged that Lewis' behavior around the time of the murders was purposeful and "goal-directed."

The mitigation evidence on the issue of whether Lewis suffered from a dependent personality disor-

der also was in dispute. Dr. Costanzo and Dr. Haskins concluded that Lewis suffered from a dependent personality disorder. Dr. Costanzo explained that as a result of this disorder, Lewis experienced many problems, including trouble making ordinary decisions without the advice of others, a difficulty initiating activities on her own, and a need for other people to assume responsibility for most major aspects of her life.

Dr. Hagan, however, gave contrary testimony that Lewis did not suffer from such a personality disorder but exhibited conduct that showed "a passive aggressive or an aggressive dependency." According to Dr. Hagan, these characteristics involved the use of other people to achieve one's objectives.

With regard to Lewis' drug use, Dr. McCance-Katz testified that Lewis had a severe addiction to drugs and that the amount of narcotic medications she was taking during the time of the murders would have impaired her cognition and inhibited the "affect" or expression that she displayed to others. However, Dr. McCance-Katz admitted that Lewis' ability to carry out the murder plans was not affected by her use of prescription drugs.

Dr. Eliacin and Deborah Grey also concluded that Lewis was addicted to prescription drugs. In addition, Dr. Haskins testified that Lewis had a dependence on narcotics.

In contrast, Dr. Hagan testified that "there is not sufficient eyewitness, third party report, nor evidence of record to support the conclusion that she was actually addicted." Further, Lewis had not complained of any problems associated with drug with-

drawal when incarcerated about one week after the murders.

This evidence concerning Lewis' prescription drug abuse is evidence of a type that the Court in *Wiggins* termed "double edge[d]." *See Wiggins*, 539 U.S. at 535, 123 S.Ct. 2527. While Lewis presented evidence at the habeas hearing that her abuse of narcotics and other prescription drugs could have affected her judgment and have caused her to appear "uncaring" at the time of the offenses, the evidence also showed that, initially, Lewis voluntarily consumed excessive prescription drugs. Therefore, this evidence could be viewed both in aggravation and mitigation of the offense.

*Lewis*, 645 S.E.2d at 505-06. In sum, the court determined that the evidence of the "various problems Lewis faced as a result of her personality deficits, drug dependence, and level of intellectual functioning" failed to demonstrate prejudice because the totality of the evidence "showed that notwithstanding the various difficulties Lewis experienced over the course of her life, she killed her two relatives solely for monetary gain in a deliberately planned and executed scheme. Any psychological, cognitive, and physical difficulties Lewis may have had could not explain or even mitigate the carefully calculated conduct that Lewis exhibited in carrying out these crimes." *Id.* at 506.

Given our own review of the evidence, we cannot say that this determination was an unreasonable one. First, the factual evidence surrounding these murders demonstrates that it was Lewis who was uniquely positioned to plan or, as the Virginia Supreme Court held on direct appeal, "mastermind . . . these gruesome crimes, which would not have occurred but for her actions." *Lewis*, 593 S.E.2d at 228. Lewis was Julian's wife and C.J.'s stepmother. As beneficiary of Julian's estate, and C.J.'s life insurance if Julian were dead, she alone stood to

profit handsomely from their joint murder. There was also evidence that Lewis was well aware of this potential as, prior to the murders, she bragged to others that she was marrying Julian for his money and that she would benefit financially if Julian and C.J. were dead.

In contrast to her intimate involvement with the victims, Shallenberger and Fuller had never met Julian or C.J. and, without Lewis, had no way of knowing their expected movements or whereabouts. The men were also substantially younger than the more experienced and knowledgeable Lewis who, as found by the state court, lured the men into helping her achieve her financial payoff through sexual favors and money. She even went so far as to involve her 16-year-old daughter (whom the men also did not previously know) in the planning process and, on at least one occasion, she took her daughter with her to meet the men where they engaged in simultaneous, sexual relations in side-by-side vehicles.

The specific actions taken in preparation for the murders also demonstrate Lewis's ability to plan and carry out the murderous plot. After meeting the men and enlisting their help to kill Julian, Lewis withdrew $1,200 cash from her bank, which she gave to Shallenberger to purchase the murder weapons and, during the planning process, she initiated approximately 160 of the 170 documented telephone calls between her and Shallenberger. Also, only Lewis could have provided the men with the necessary information regarding her husband's employment, expected movements, and route home for the first, unsuccessful attempt to murder him on the roadway. Only Lewis could have advised the men that she would also benefit as the secondary beneficiary of C.J.'s life insurance, prompting the added plan to murder him when he came home for his father's funeral. Only Lewis could have advised the men that, as luck would have it, C.J. would be coming home from active duty for a visit and could more easily be murdered alongside his father. And, only Lewis could have provided the men with the expected whereabouts of the

intended victims when they entered the mobile home to kill them.

The actions taken by Lewis at the time of the murders, and immediately thereafter, also eliminate any reasonable likelihood that Lewis was incapable of carrying out the murder plan while away from any asserted influence or control of the triggermen, or that her low IQ and prescription drug use rendered her incapable of making the necessary plans and decisions. On the night of the murders, unaided by her co-conspirators, Lewis engaged in a number of activities designed to ensure that everything appeared normal to her husband and stepson, made sure the coast was clear for the triggermen, and took steps to cover her involvement. She prayed with her husband, lay down with him, and then got up to make the necessary preparations. At some point she prepared the lunch bag for him with the attached love note and "smiley face," presumably to deflect attention from her as a suspect, and, according to her, spent time with her stepson as well. Before returning to her bed with Julian, she unlocked the back door for the shooters and also confined the dog, a pit bull, in the middle bedroom where it could not interfere with them or their plans.

After the murders had been committed, and the triggermen had left, Lewis continued to exhibit this ability to operate alone in carrying out the plot. She waited from 30 to 45 minutes before calling 911, presumably hoping that Julian would finally die, making telephone calls to others in the interim. When the police finally arrived, she calmly related a false story of an unknown intruder and, while on the telephone, made a comment within earshot of the officers blaming C.J. for leaving the door unlocked. Her ability to further the intended goal of financial profit, without oversight or direction from her co-conspirators, was also immediately demonstrated. While her victims were still in the mobile home, Lewis set about to obtain Julian's most recent paycheck from his employer. Later that afternoon, she spoke with Lt. Booker

and advised him that she was the sole beneficiary of C.J.'s life insurance policy. In the days that followed, Lewis contacted Lt. Booker a second time about the proceeds of the life insurance policy, telling him that Kathy could have C.J.'s personal effects so long as she got the money. She also sought to withdraw $50,000 from Julian's Prudential Securities account with a forged check that she falsely claimed he had written to her before his death. It was also later discovered that Lewis and a friend had visited an attorney shortly after the murders to ensure that Kathy would not inherit from her father and brother. Lewis also made plans to liquidate and spend her inheritance. She offered to sell Kathy her father's land and mobile home and started making plans to trade Julian's vehicle, along with the red sports car he had purchased for her before he was murdered, for a larger car. Finally, Lewis demonstrated no difficulty in making the funeral arrangements for her victims. By the morning after the murders, she had already spoken to the funeral home about the arrangements, and attempted to subtly exclude Kathy from the process. She also purchased a new suit for the occasion, and had her hair and nails done as well.

In the face of this overwhelming evidence of Lewis' actual capacity to act alone and make decisions to further the murderous plot, Lewis presented comparatively weak evidence that this alleged dependent personality disorder combined with her low IQ and prescription drug abuse to render her *incapable* of acting in that capacity and explain the "cold" affect and demeanor she exhibited during and after the murders. While Lewis had a low IQ, her education records indicated that she successfully attended school for some time and was an average student. There was no evidence of Shallenberger's comparative intelligence, and Fuller's IQ was much lower than Lewis' IQ. There was also little evidence to support Lewis' claim that a drug dependency played any significant part in the crime. By her own admission, she was not under the influence of any drugs at the time of the murders,

and there was no evidence that she experienced withdrawal or other adverse effects after she was arrested and incarcerated.

In sum, having fully considered the evidence in support of the vileness aggravator, and the totality of the mitigating evidence presented at the sentencing hearing and on state habeas to refute and mitigate that aggravator, the Virginia Supreme Court properly analyzed this claim under *Strickland* and its progeny, and held that there was no reasonable probability that the sentencer, had he been confronted with the additional evidence, would have rejected the vileness aggravator or, barring that, otherwise found that there was sufficient evidence in mitigation to warrant rejection of the penalty of death. Having independently considered Lewis' contentions, we cannot say that the state court's adjudication of Lewis' claims is contrary to or an unreasonable application of the applicable precedents. Accordingly, Lewis is not entitled to habeas relief on this basis and we affirm the dismissal of these claims.

## IV.

We turn now to Lewis' remaining claims, all of which are rooted in her constitutional challenge to Va. Code Ann. § 19.2-257, and to the validity of her guilty plea, based upon the principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).

## A.

Under Virginia's capital sentencing scheme, when a defendant is charged with a death-eligible offense, the trial court conducts a bifurcated proceeding. "[T]he court shall first submit to the jury the issue of guilt or innocence of the defendant of the offense charged in the indictment . . . ." Va. Code Ann. § 19.2-264.3(A). If the defendant is found guilty of a death-eligible offense, "then a separate proceeding before the same jury shall be held as soon as is practicable on the issue of the penalty, which shall be fixed as is provided in § 19.2-264.4."

Va. Code Ann. § 19.2-264.3(C). When a defendant pleads guilty and waives his or her right to a jury determination of guilt, however, Va. Code Ann. § 19.2-257 provides that the trial judge will conduct the sentencing proceeding alone, determine whether an aggravating factor or factors exist, and make the determination of whether death is the appropriate sentence.[5]

Lewis contends that she had a constitutional right under *Apprendi/Ring* to plead guilty and have a jury determine the existence of the aggravating factors necessary to impose the sentence of death, and that Va. Code Ann. § 19.2-257 deprived her of this right. Lewis also challenges the validity of her guilty plea, contending that, because the trial judge's plea colloquy failed to advise her of this purported right, her guilty plea and accompanying waiver of a jury trial were not made knowingly and intelligently.

Because Lewis failed to challenge the constitutionality of the statute or the validity of her guilty plea before the state trial judge or on direct appeal, however, the state habeas court held that the claims were procedurally barred under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974) (holding that claims that could have been raised at trial or on direct appeal may not be raised on state collateral review). It has long been held that federal habeas courts are precluded from reviewing a claim that "a state court has declined to consider [on] its merits on the basis of an independent and adequate state procedural rule," *Bacon v. Lee*, 225 F.3d 470, 476 (4th Cir.

---

[5]*See* Va. Code Ann. § 19.2-257 ("Upon a plea of guilty in a felony case, tendered in person by the accused after being advised by counsel, the court shall hear and determine the case without the intervention of a jury; or if the accused plead not guilty, with his consent after being advised by counsel and the concurrence of the attorney for the Commonwealth and of the court entered of record, the court shall hear and determine the case without the intervention of a jury. In such cases the court shall have and exercise all the powers, privileges and duties given to juries by any statute relating to crimes and punishments.").

2000); *see Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991), and that the *Slayton* procedural bar qualifies as such an adequate and independent state law ground, *see Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006). Thus, "[a]bsent a fundamental miscarriage of justice, which [Lewis] does not assert, [we] may not review [the] claims unless [Lewis] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Id.* (internal quotation marks omitted); *see also Coleman*, 501 U.S. at 750.

### B.

Lewis asserts—both as independent grounds for relief and to demonstrate the requisite cause which would allow us to review her substantive claims on the merits — that her counsel was constitutionally ineffective in (1) failing to inform her that she had a right to plead guilty and obtain a jury determination of aggravating factors and (2) failing to preserve the challenge to the statute before the trial judge.

In order to prevail on her claim, Lewis must demonstrate that a reasonably competent attorney would have believed that the *Apprendi/Ring* cases established that a defendant who pleads guilty to a capital offense and waives his or her right to a jury trial nevertheless retains a right to a jury determination of aggravating factors. Lewis must also demonstrate that counsel's failure to raise the issue with her and the trial judge prejudiced her because, had they done so, there is a reasonable probability that the outcome of her sentencing proceeding would have been different. We hold that she has failed to meet this burden.

### 1.

First, neither *Apprendi* nor *Ring* holds that a defendant who pleads guilty to capital murder and waives a jury trial under the state's capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors.

In *Apprendi*, the defendant pleaded guilty to two firearm offenses carrying maximum sentences of ten years each, preserving his right to challenge the constitutionality of any enhancement under a separate, hate-crime statute. *See Apprendi*, 530 U.S. at 469-70. At sentencing, the trial judge increased the sentence for one firearm count to twelve years based upon the hate-crime law and defendant appealed. *See id.* at 468, 471. The Supreme Court reversed the enhanced sentence, holding that the sentencing facts necessary to increase the defendant's maximum punishment served as elements of the enhanced or separate offense and, therefore, were required to be found by a jury. *See id.* at 490 (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). *Apprendi* was not a capital case, however, and the Supreme Court specifically noted that its decision did not invalidate capital sentencing schemes which allow judges to determine the existence of aggravating factors necessary to impose a sentence of death following a jury's conviction of a defendant for a capital crime. *See id.* at 496-97 (noting that the Court had "previously considered and rejected the argument that the principles guiding [its] decision . . . render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." (citing *Walton v. Arizona*, 497 U.S. 639, 647-49 (1990)). Thus, as the district court noted below, "if anything, *Apprendi* would have led a reasonable defense attorney to believe that capital defendants were *not* entitled to a jury determination of the aggravating factors, regardless of whether they pled guilty to capital murder or proceeded to a jury trial." J.A. 2697.

In *Ring*, the defendant was convicted of a capital crime by a jury and sentenced to death by the trial judge pursuant to the Arizona capital sentencing scheme previously upheld in *Walton*. *See Ring*, 536 U.S. at 588-89. The Court reversed, how-

ever, overruling its decision in *Walton* and holding that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" the defendant also has a right to have them submitted to the jury for its determination. *Ring*, 536 U.S. at 609. *Ring*, therefore, established that a defendant who has exercised his right to a jury trial on a capital offense is also entitled to a jury determination of the aggravating factors necessary to impose the sentence of death.

Lewis contends that any reasonable attorney or jurist would have concluded after *Ring* that a defendant who pleads guilty to a capital offense—and waives his right to a jury pursuant to a state statute that mandates that a judge conduct the sentencing proceeding when such a guilty plea is entered — retains this constitutional right to have a jury determine the existence of aggravating factors. However, neither *Apprendi* nor *Ring* stand for that proposition. In both cases, the challenged sentencing procedures denied defendants the option of having a jury determine a sentence enhancement, or aggravating factor, *regardless* of whether the defendant pleaded guilty or not guilty to the charged offense. In *Apprendi*, the defendant pleaded guilty but expressly preserved his right to challenge any hate-crime enhancement. And in *Ring*, the defendant was convicted of capital murder by a jury. Thus, in neither case did the defendant waive his right to a jury determination of facts upon which the enhancement or aggravating factor rested.

In short, the *Ring* decision did not clearly establish or even necessarily forecast that a capital defendant who pleads guilty and waives his right to a jury trial can insist upon a jury trial on aggravating factors. As noted by the district court, the claim that "a defendant who pleads guilty to a capital offense is nonetheless entitled to a jury determination of the aggravating factors would have been an *extension* of" that precedent. J.A. 2698 (emphasis added). Consequently, we cannot say that counsel's failure to question the constitutionality of the

Virginia statute and discuss the issue with Lewis amounted to objectively unreasonable performance. *See Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Honeycutt v. Mahoney*, 698 F.2d 213, 217 (4th Cir. 1983) (noting that counsel was not ineffective for failing to perceive an extension of precedent).[6]

2.

Second, even if we were to conclude that reasonable counsel would have recognized a potential *Apprendi/Ring* challenge to the Virginia statute, Lewis cannot meet her burden of demonstrating deficient performance by counsel which prejudiced her because pressing the issue in this case would have been in direct conflict with the defense strategy to have Lewis plead guilty *in order to* obtain sentencing before the judge instead of a jury.

As noted previously, Lewis was provided appointed counsel with extensive criminal experience, including experience in handling capital cases.[7] In light of the overwhelming evi-

---

[6]The Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), was not issued until after Lewis pleaded guilty and her sentences were affirmed on appeal. *See id.* at 303 (holding that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" (emphasis omitted)). Thus, we express no opinion as to what effect, if any, *Blakely* has upon the question of whether a capital defendant has a constitutional right to plead guilty and demand a jury trial on aggravating factors or under what circumstances that right, if it exists, will be deemed waived. *See Blakely*, 542 U.S. at 310 (noting that "[i]f appropriate waivers are procured, States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty" and that "[e]ven a defendant who stands trial may consent to judicial factfinding as to sentence enhancements").

[7]Attorney Blaylock had twenty-three years of experience and had handled at least fifteen capital murder cases. Attorney Furrow had twenty-six years of experience and had worked with Blaylock on as many as ten capital murder cases.

dence of guilt and Lewis' confession, counsel first attempted to obtain an agreement that the Commonwealth would not seek the death penalty in return for Lewis' guilty plea. The prosecutor, however, viewed Lewis as "the worst of the three [conspirators] and . . . was . . . adamant about seeking the death penalty against her." J.A. 2177.

As the investigation continued, and the case developed, counsel became increasingly concerned about the gruesome nature of the crimes, which was graphically reflected in the crime scene photographs, and the chilling nature of the evidence of Lewis' actions before and after the murders to plan and profit from them. Based upon their knowledge of typical juries in the area, and available information regarding the assigned trial judge, counsel believed that a death sentence by a jury was a virtual certainty and that Lewis stood a better chance of being sentenced to life imprisonment by the trial judge. Of particular note, counsel was aware of no cases in which the trial judge had imposed a death sentence and, as a result of a cooperation deal between the prosecution and Fuller, knew that the trial judge would sentence Fuller to life imprisonment for his role as an actual triggerman in the murders.[8]

In a ten-page letter to Lewis, Attorney Furrow summarized the expected testimony and evidence that would be presented at trial, along with counsel's concerns. Attorney Furrow pointed out to Lewis the "particularly gruesome" photographs of the bodies of Julian and C.J. as "among the worst I have seen" due to "[t]he use of small caliber ammunition." J.A. 1033. He also advised Lewis that they fully expected the prosecutor to engage in the dramatic tactic of "rack[ing] the [pump] shot gun" while showing the photographs, a particu-

---

[8]In addition to relying upon their own experience, counsel sought guidance and opinions from at least one national death penalty expert, as well as local criminal defense attorneys who regularly practiced before the trial judge.

larly effective technique which counsel had personally wit-
nessed in another case. J.A. 1033. Counsel also discussed the
murder-for-hire and profit facts and the expected testimony by
Lewis' minor daughter that Lewis "sat in the car next [to her]
while she was having sex with an adult black male," which
counsel believed would "have a horrible impact on the jury
both among white[s] and blacks, men and women." J.A. 1033.

In light of their opinion that death was a virtually certain
penalty if Lewis were sentenced by a jury, counsel advised
Lewis that her "best chance to receive a sentence of life in
prison without the possibility of parole [was] to plead guilty
and take [her] chances with the Judge." J.A. 1036. In doing
so, counsel explained that pleading guilty and being sentenced
by the trial judge had several advantages, including: (1)
removal of the "drama" from the case, such as having the jury
hear "the racking of the shotgun" which would "not have the
same impact on the Judge as it would on a jury"; (2) the fact
that Fuller would have already received a life sentence and
counsel's belief that the judge's "sense of fairness" would
render him "more likely to hand out similar sentences"; (3)
the fact that there had only been "two cases in Virginia in
which the hirer in a murder for hire case ha[d] received the
death penalty"; (4) the fact that "[a] woman ha[d] never
received the death penalty"; and (5) the fact that Lewis "ha[d]
no history of violent crimes." J.A. 1036.

Counsel also met with Lewis to discuss their concerns and
opinions. According to counsel, Lewis appeared to understand
their advice, was in agreement with it, and made the decision
to plead guilty. Lewis voluntarily signed the letter, stating that
she "wish[ed] to plead guilty and be sentenced by the Judge."
J.A. 1037. In connection with this guilty plea, the competency
assessment performed by Dr. Haskins revealed that Lewis
"was able to recount her basic defense strategy . . . and . . .
explain the reasons behind the strategy," understood "the role
of a jury in a capital case, and of a judge," and knew "the pros
and cons of a jury [versus] a bench trial." J.A. 1194, 1195.

With the benefit of hindsight, Lewis now contends that her counsel was ineffective in failing to preserve and advise her of a potential challenge to the constitutionality of the Virginia statute based upon *Apprendi/Ring*. However, it is well established that when considering claims that counsel's performance has been constitutionally ineffective in a state proceeding, our scrutiny must be "highly deferential." *Strickland*, 466 U.S. at 689.

> It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* (internal citation omitted). To prevail, Lewis must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). And, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Here, Lewis has failed to demonstrate that counsel's strategy to have her plead guilty and take advantage of her statutory right to have a judge sentence her was unsound. And Lewis' current claim—that she would have insisted on pleading guilty and have a jury determine her sentence — is wholly inconsistent with this reasonable and agreed-upon strategy at the time. In sum, Lewis' current claim "suffer[s] from the classic hindsight that we are cautioned not to apply to upset state court judgments." *Emmett*, 474 F.3d at 171.[9] Accord-

---

[9]We also note that, in contrast to the many ineffective assistance of counsel claims that require state and federal habeas courts to consider

ingly, even if we were to determine that counsel should have been aware of a potential *Apprendi/Ring* challenge to the state statute, counsel's failure to raise the issue with Lewis and preserve the challenge before the trial judge in the circumstances of this case did not amount to objectively unreasonable performance.

For the same reasons, Lewis has failed to demonstrate that she was prejudiced by counsel's failure to raise the potential *Apprendi/Ring* challenge to the statute. *See Strickland*, 466 U.S. at 694. In order to demonstrate such prejudice, Lewis must show that there is a reasonable probability that she would have pleaded guilty and demanded a jury sentencing. Lewis does summarily now contend that she would have done so, asserting that this would have allowed her to demonstrate to the jury that she was remorseful and had accepted responsibility for her crimes. However, this assertion wholly ignores the agreed-upon strategy at the time, which was not simply to plead guilty in order to bolster the evidence of Lewis' cooperation and confession, but rather to achieve the goal of removing the sentencing decision from the hands of the jury and placing it with a judge the defense reasonably believed would be more inclined to sentence her in parity with her co-conspirators. There were but two means to employ this strategy. The prosecutor had to consent to trial by jury on guilt and sentencing before the judge, which would not have served any of Lewis' goals, or Lewis had to plead guilty in order to take advantage of the very statute she now seeks to challenge. Accordingly, Lewis has failed to demonstrate a reasonable probability that, had counsel recognized a potential challenge to the constitutionality of the statute and advised her of that

---

after-the-fact explanations by defense counsel regarding their investigations and strategy decisions, Lewis' counsel's strategy was quite clearly laid out in a comprehensive letter to the defendant and signed by her. This was followed by the trial judge clearly advising Lewis that she was waiving her right to a jury and that she would be sentenced by him instead.

potential challenge, she would have abandoned the agreed-upon strategy and opted instead to plead guilty and insist upon a sentencing proceeding before a jury.[10]

## C.

Having fully considered the record in this case, we agree that Lewis has failed to demonstrate that counsel's failure to preserve and advise her of a possible *Apprendi/Ring* challenge to the constitutionality of Va. Code Ann. § 19.2-257 rises to the level of constitutionally deficient representation and has also failed to demonstrate that she was prejudiced as a result of counsel's alleged deficiencies. Accordingly, we affirm dismissal of her ineffective-assistance-of-counsel claims on the merits, as well as the dismissal of her procedurally defaulted challenges to the statute and her guilty plea.

## V.

For the foregoing reasons, we affirm the district court's denial of habeas relief.

*AFFIRMED*

---

[10]To the extent Lewis presses her claim that she has demonstrated prejudice from counsel's failure to preserve the *Apprendi/Ring* challenge to the state statute because there is a reasonable probability that the death sentence she received from the trial judge would have been reversed by a federal court, we are unpersuaded. Lewis' attempt to demonstrate prejudice in this way is more accurately described as a claim that her counsel's performance was deficient because they failed to advance an argument before the trial judge that they did not wish to prevail upon, solely for the purpose of setting up an appealable ground should their actual strategy fail. Although the Constitution guarantees criminal defendants a competent attorney, and one that employs reasonable strategies for success, it does not require defense counsel to engage in such judicial game-play, and the speculation required to guess what might have occurred had counsel made the attempt falls far short of the standard necessary for federal habeas courts to upset valid state court judgments.